Daniel S. Bleck *(pro hac vice)*
Paul J. Ricotta *(pro hac vice)*
Ian A. Hammel *(pro hac vice)*
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
Email: dsbleck@mintz.com
Email: pjricotta@mintz.com
Email: iahammel@mintz.com

Abigail V. O'Brient (SBN 265704)
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
2029 Century Park East, Suite 1370
Los Angeles, CA 90067
Tel: 310-586-3200
Fax: 310-586-3200
Email: avobrient@mintz.com

*Attorneys for UMB Bank, N.A. as
master indenture trustee and Wells
Fargo Bank, National Association, as
indenture trustee*

Jason D. Strabo (SBN 246426)
MCDERMOTT WILL & EMERY LLP
2049 Century Park East, 38th Floor
Minneapolis, MN 55402
Tel: 310-788-4125
Fax: 310-277-4730
Email: jstrabo@mwe.com

Nathan F. Coco (admitted pro hac vice)
Megan Preusker (admitted pro hac vice)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606-0029
Tel: 312-327-2000
Fax: 312-984-7700
Email: ncoco@mwe.com
Email: mpreusker@mwe.com

Jason M. Reed (admitted pro hac vice)
MASLON LLP
90 South Seventh Street, Suite 3300
Minneapolis, MN 55402
Tel: 612-672-8200
Fax: 612-642-8301
Email: Jason.Reed@maslon.com

*Attorneys for U.S. Bank National
Association, not individually but as
Series 2015 Note Trustee and Series
2017 Note Trustee, respectively*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

In re

VERITY HEALTH SYSTEM OF
CALIFORNIA, INC., *et al.*,[1]

                              Debtors

District Court Case Number:
    2:18-cv-10675-RGK

Bankruptcy Court Case Number:
    2:18-bk-20151-ER

---

[1] The other Debtors in the chapter 11 cases, being jointly administered under Lead Case No. 2:18-bk-20151-ER, are O'Connor Hospital 2:18-bk-20168-ER, Saint

| | |
|---|---|
| Official Committee of Unsecured Creditors of Verity Health System of California, Inc.<br><br>Appellant<br><br>v.<br><br>Verity Health System of California, Inc.<br><br>Appellee | Adversary Case Number:<br><br>N/A<br><br><br><br>**JOINT BRIEF OF INTERVENING APPELLEES UMB BANK, N.A., WELLS FARGO BANK, NATIONAL ASSOCIATION, AND U.S. BANK, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEES** |
| -and-<br><br>UMB Bank, N.A., as master indenture trustee and Wells Fargo Bank, National Association, as indenture trustee, and U.S. Bank National Association, as Series 2015 Note Trustee and Series 2017 Note Trustee,<br><br>Intervening Appellees | |

Louise Regional Hospital 2:18-bk-20162-ER, St. Francis Medical Center 2:18-cv-20165-ER, St. Vincent Medical Center 2:18-bk-20164-ER, Seton Medical Center 2:18-cv-20167-ER, O'Connor Hospital Foundation 2:18-bk-20179-ER, Saint Louise Regional Hospital Foundation 2:18-cv-20172-ER, St. Francis Medical Center of Lynwood Foundation 2:18-cv-20178-ER, St. Vincent Foundation 2:18-cv-20180-ER, St. Vincent Dialysis Center, Inc. 2:18-cv-20171- ER Seton Medical Center Foundation 2:18-cv-20175-ER, Verity Business Services 2:18-cv-20173-ER, Verity Medical Foundation 2:18-cv-20169-ER, Verity Holdings, LLC 2:18-cv-20163-ER, DePaul Ventures, LLC 2:18-cv-20176-ER, and DePaul Ventures - San Jose Dialysis, LLC 2:18-cv-20181-ER.

# CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO FED. R. BANKR. P. 8012

Pursuant to Fed R. Bankr. P. 8012, (i) UMB Bank, N.A. states that it is a federally chartered banking institution and is a wholly owned subsidiary of UMB Financial Corporation, a publicly held corporation, and (ii) Wells Fargo Bank, National Association states that it is a federally chartered banking institution, that it has no parent corporation, and that there is no publicly held corporation which owns 10% or more of its stock.

Dated: April 15, 2019

MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.

/s/ Abigail V. O'Brient
Abigail V. O'Brient

and

Daniel S. Bleck *(pro hac vice)*
Paul J. Ricotta *(pro hac vice)*
Ian A. Hammel *(pro hac vice)*

*Attorneys for UMB Bank, N.A. as master indenture trustee and Wells Fargo Bank, National Association, as indenture trustee*

1
2

**CORPORATE DISCLOSURE STATEMENT
PURSUANT TO FED. R. BANKR. P. 8012**

3
4
5

    Pursuant to Federal Rule of Bankruptcy Procedure 8012, U.S. Bank National Association states that it is a subsidiary of U.S. Bancorp, and that no publicly traded corporation other than U.S. Bancorp owns 10% or more of it.

6
7

Dated: April 15, 2019           MCDERMOTT WILL & EMERY LLP

8
9

By:    /s/ Jason D. Strabo
         Jason D. Strabo

10
11

and

MASLON LLP

12
13

By:    /s/ Jason M. Reed
         Jason M. Reed *(pro hac vice)*

14
15
16

*Attorneys for U.S. Bank National Association, not individually but as Series 2015 Note Trustee and Series 2017 Note Trustee, respectively*

17
18
19
20
21
22
23
24
25
26
27
28

1

**TABLE OF CONTENTS**

2

3    I.      STATEMENT OF THE CASE ................................................................1

4           A.   Introduction .................................................................1

5           B.   Factual Background.......................................................5

6    II.     STANDARD OF REVIEW ..............................................................10

7    III.    ARGUMENT.....................................................................................11

8

9          A.   The Adequate Protection Package Approved by the Bankruptcy Court, Including the Waivers, Was Granted as Part of an Appropriate

10        Exercise of the Bankruptcy Court's Discretion...............................................11

11          B.   The Bankruptcy Court Properly Exercised Its Discretion in

12        Approving the 506(c) Waiver.........................................................14

13              1.   The Scope of Section 506(c) Is Extremely Narrow, and It Is Unlikely That Any Such Claim Would be Successful,

14                 Especially Given the Prepetition Secured Creditors'

15                 Admitted Equity Cushion. .......................................................15

16              2.   Section 506(c) Waivers Are Commonplace and Not

17                 Contrary to Public Policy...........................................................18

18              3.   The Prepetition Secured Creditors Are Effectively Funding the Bankruptcy Cases as a Result of Their

19                 Consent to be Primed by the DIP Lender and Are Therefore Entitled to the Section 506(c) Waiver......................21

20

21              4.   The Bankruptcy Court Weighed the Propriety of the Section 506(c) Waiver in Light of the Expenses to be Incurred in This Case and Found It Appropriate and

22                 Justified. .................................................................................22

23          C.   The Bankruptcy Court Properly Exercised Its Discretion in

24        Approving the 552(b) Waiver ......................................................23

25    IV.    CONCLUSION .............................................................................27

26

27

28

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Compton Impressions, Ltd. v. Queen City Bank N.A. (In re Compton Impressions)*,
    217 F.3d 1256 (9th Cir. 2000) ............................................................17

*Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.)*,
    255 F.3d 1061 (9th Cir. 2001) ......................................................14,15

*Hari Ram, Inc. v. Magnolia Portfolio, LLC (In re Hari Ram, Inc.)*,
    507 B.R. 114 (Bankr. M.D. Pa. 2014) ................................................11

*Hartford Underwriters Ins. Co. v. Union Planters Bank*,
    530 U.S. 1 (2000) ....................................................................14, 15

*In re 944 Media, LLC*,
    Case No. 2:10-23240-AA, 2010 Bankr. LEXIS 3904 (Bankr. C.D. Cal. May 7, 2010) ...............................................................19

*In re Am. Mariner Indus., Inc.*,
    27 B.R. 1004 (B.A.P. 9th Cir. 1983) ..................................................11

*In re Antico Mfg. Co.*,
    31 B.R. 103 (Bankr. E.D.N.Y. 1983) ..................................................22

*In re Bluejay Props., LLC*,
    BAP No. KS-12-105, 2014 Bankr. LEXIS 949 (B.A.P. 10th Cir. Mar. 12, 2014) ...............................................................13, 14

*In re Briggs Transp. Co.*,
    35 B.R. 210 (Bankr. D. Minn. 1983) ..................................................12

*In re Cascade Hydraulics & Utility Service, Inc.*,
    815 F.2d 546 (9th Cir. 1987) ....................................................14, 15

*In re Codesco, Inc.*,
    18 B.R. 225 (Bankr. S.D.N.Y. 1982) ..............................................16, 17

*In re Downey Reg'l Med. Center-Hospital, Inc.*,
    Case No. 09-bk-34714-BB, 2010 Bankr. LEXIS 5205 (Bankr. C.D.
    Cal. Sept. 17, 2010) .................................................................................. 19, 26

*In re Gardens Reg'l Hosp. & Med. Ctr, Inc.*,
    Case No. 2:16-bk-17463-ER, 2016 Bankr. LEXIS 4715 (Bankr. C.D.
    Cal. Jul. 28, 2016) ........................................................................................... 19

*In re Gen. Growth Props., Inc.*,
    Case No. 09-11977 (ALG), 2010 Bankr. LEXIS 5552 (Bankr.
    S.D.N.Y. Jul. 22, 2010) ................................................................................... 26

*In re Gen. Motors Corp., et al.*,
    Case No. 09-50026(REG) (Bankr. S.D.N.Y. Jun. 25, 2009) ........................... 20

*In re Goldberg*,
    168 B.R. 382, 384 (B.A.P. 9th Cir. 1994) ....................................................... 10

*In re iHeartMedia, Inc., et al.*,
    Case No. 18-31274 (MI) (Bankr. S.D. Tex. Apr. 12, 2018) ............................ 20

*In re InteliQuest Media Corp.*,
    326 B.R. 825 (B.A.P. 10th Cir. 2005) ............................................................. 19

*In re Lee*,
    Case No, 18-6851 (JFW), 2018 U.S. Dist. LEXIS 223420 (C.D. Cal.
    Dec. 7, 2018) ................................................................................................... 10

*In re Majestic Star Casino, LLC*,
    Case No. 09-14136(KG), 2009 Bankr. LEXIS 5014 (Bankr. D. Del.
    Nov. 30, 2009) ................................................................................................. 26

*In re Metaldyne Corp.*,
    Case No. 09-13412(MG), 2009 Bankr. LEXIS 1533 (Bankr. S.D.N.Y.
    Jun. 23, 2009) .................................................................................................. 22

*In re Muma Servs.*,
    322 B.R. 541 (Bankr. D. Del. 2008) ........................................................... 24, 25

*In re OccMeds Billing Servs.*,
    Case No. 07-28444-A-11, 2007 Bankr. LEXIS 4136 (Bankr. E.D. Cal.
    Dec. 1, 2007) ................................................................................................... 16

*In re Pelham Street Assocs.*,
    131 B.R. 260 (Bankr. D. R.I. 1991) ..................................................................11

*In re Photo Promotion Assocs.*,
    61 B.R. 936 (Bankr. S.D.N.Y. 1986) ..............................................................24

*In re Pine Lake Village Apartment Co.*,
    19 B.R. 819 (Bankr. S.D.N.Y. 1982) ..............................................................25

*In re Real Mex Restaurants, Inc.*,
    Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 4, 2011) ...............................22

*In re Robertson*,
    14 B.R. 706 (Bankr. N.D. Ga. 1981) ..............................................................17

*In re Sears Holdings Corp., et al.*,
    Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 30, 2018)..........................20

*In re Spheris Inc.*,
    Case No. 10-10352(KG), 2010 Bankr. LEXIS 5764 (Bankr. D. Del.
    Feb. 23, 2010)..................................................................................................26

*In re Sunnymead Shopping Ctr. Co.*,
    178 B.R. 809 (B.A.P. 9th Cir. 1995) ..............................................................10

*In re Walking Co.*,
    9:09-bk-15138-RR, 2010 Bankr. LEXIS 5194 (Bankr. C.D. Cal.
    Jan. 14, 2010)......................................................................................19, 20, 26

*In re Ware*,
    Case No. 12-30566-KLP, 2014 Bankr. LEXIS 2437 (Bankr. E.D. Va.
    Jun. 3, 2014) ...................................................................................................16

*McAlpine v. Comerica Bank-Detroit (In re Brown Brothers Inc.)*,
    136 B.R. 470 (W.D. Mich. 1991) ...................................................................19

*Paccom Leasing Corp. v. Deico Elects., Inc. (In re Deico Elects., Inc.,)*
    139 B.R. 945 (B.A.P. 9th Cir. 1992) ..............................................................10

*People's Capital & Leasing Corp. v. Big3D, Inc. (In re Big3D, Inc.)*,
    438 B.R. 214 (B.A.P. 9th Cir. 2010) ..............................................................10

iv

*Scottsdale Medical Pavilion v. Mutual Benefit Life Ins. Co. (In re Scottsdale Medical Pavilion)*,
   159 B.R. 295 (B.A.P. 9th Cir. 1993) ...................................................... 11

*Toledo Trust Co. v. Roberts (In re Nicholson Indus., Inc.)*,
   73 B.R. 266 (Bankr. N.D. Ohio 1987) ................................................... 16

*Weinstein v. Gill (In re Cooper Commons LLC)*,
   512 F.3d 553 (9th Cir. 2008) ............................................................... 19

**Statutes**

11 U.S.C. § 363 ............................................................................... 11, 22

11 U.S.C. § 364 ...................................................................................... 11

11 U.S.C. § 506 ............................................................................... *passim*

11 U.S.C. § 552 ............................................................................... *passim*

11 U.S.C. § 1107 ...................................................................................... 5

11 U.S.C. § 1108 ...................................................................................... 5

**Bankruptcy Rules**

Local Bankruptcy Rules of Central District of California 9013-1 ............ 8

Local Bankruptcy Rules of District of Delaware 4001-2 ........................ 26

**Other Authorities**

2 Collier on Bankruptcy ¶ 361.01[1] (15th ed.) ................................... 11

4 Collier on Bankruptcy ¶ 506.05 (16th ed. 2019) ............................... 14

1    UMB Bank, N.A., solely in its capacity as master indenture trustee, and Wells

2    Fargo Bank, National Association, and U.S. Bank National Association, solely in

3    their respective capacities as indenture trustees (the "<u>Prepetition Secured</u>

4    <u>Creditors</u>"), having been granted authority by this Court to intervene in this appeal,

5    hereby submit their joint brief in opposition to Appellant's initial brief filed by the

6    Official Committee of Unsecured Creditors of Verity Health System of California,

7    Inc., et al. (the "<u>Committee</u>").   The Prepetition Secured Creditors respectfully

8    request that the Court deny the relief sought by the Committee and affirm the *Final*

9    *Order (A) Authorizing the Debtors to Obtain Post-petition Financing; (B)*

10   *Authorizing the Debtors to Use Cash Collateral; and (C) Granting Adequate*

11   *Protection to Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 105, 363, 364,*

12   *1107 and 1108*, entered by the United States Bankruptcy Court for the Central

13   District of California (the "<u>Bankruptcy Court</u>") on October 4, 2018 (Committee's

14   Appx. No. 34; Bankruptcy Docket No. 409), as subsequently modified by the

15   Bankruptcy Court (the "<u>Final DIP Order</u>").

16   **I.    STATEMENT OF THE CASE**

17         **A.    Introduction**

18         These bankruptcy cases were filed on an urgent basis to facilitate a going

19   concern sale of the Debtors' highly leveraged hospitals which were facing a liquidity

20   crisis due to ongoing operating losses.   Following hard-fought negotiations over a

21   number of weeks, including two court hearings as well as a number of proposals and

22   counter-proposals exchanged among the parties, the Debtors presented the

23   Bankruptcy Court with an order that had been agreed upon with the Prepetition

24   Secured Creditors and others which (i) authorized post-petition financing from Ally

25   Bank N.A. (the "<u>DIP Lender</u>") in an amount up to $185 million (the "<u>DIP Facility</u>")

26   that would be secured by a lien on all of the Debtors' assets and would prime the

27   existing, first priority lien of the Prepetition Secured Creditors; (ii) authorized the

28   Debtors to use post-petition cash collateral which had been pledged to the Prepetition

1

Secured Creditors; and (iii) provided the Prepetition Secured Creditors with an adequate protection package that was intended to preserve their status as oversecured creditors having a collateral value (as determined by the Bankruptcy Court) that exceeds their secured claim by 26% - 40%, all in return for their consent to the DIP Facility and the DIP Lender's priming lien, as well as their consent to the use by the Debtors of their cash collateral. After considering the evidence, hearing the argument of counsel, and reviewing the terms of the agreed-upon order, the Bankruptcy Court properly exercised its discretion to enter the Final DIP Order, holding that the compromises reached by the parties were fair and in the best interest of the Debtors, their estates and their creditors, while also protecting the interests of the Prepetition Secured Creditors and the DIP Lender. Despite the delicate balance of competing rights agreed upon by the parties and approved by the Bankruptcy Court, the Committee has now cherry-picked for appeal two provisions of the Final DIP Order relating to the adequate protection package granted by the Bankruptcy Court to the Prepetition Secured Creditors.

Specifically, the Committee challenges the Bankruptcy Court's approval of the Debtors' agreement to (i) waive their potential ability to seek to surcharge the Prepetition Secured Creditors' collateral for any costs and expenses of preserving or disposing of such collateral during the bankruptcy cases pursuant to Section 506(c) of the Bankruptcy Code (the "Section 506(c) Waiver"), and (ii) waive their potential ability to seek to disallow otherwise valid and enforceable prepetition liens of the Prepetition Secured Creditors in any post-petition proceeds of prepetition collateral based upon the so-called "equities of the case" exception of Section 552(b) of the Bankruptcy Code (the "Section 552(b) Waiver"). [2] The Committee does not appeal any other provision of the Final DIP Order and, accordingly, must be bound by its findings and provisions.

---

[2] The Section 506(c) Waiver and the Section 552(b) Waiver are referred to collectively herein as the "Waivers."

2

1    The adequate protection package contained in the Final DIP Order is the result
2    of arms' length negotiations between the Debtors, the Prepetition Secured Creditors,
3    the DIP Lender, and other parties-in-interest.  The Waivers are an integral part of
4    this compromise and cannot be stripped from the Final DIP Order on a piecemeal
5    basis.  The Prepetition Secured Creditors were initially presented with a draft of the
6    DIP Order that did not contain a number of standard provisions, such as the Waivers,
7    which customarily appear in bankruptcy court financing orders.  The Prepetition
8    Secured Creditors rejected that draft.  Following subsequent negotiations, the parties
9    ultimately agreed upon the terms and provisions of the Final DIP Order, which
10   included the Waivers.  Without the Waivers, the Prepetition Secured Creditors do
11   not consent to be primed by the DIP Lender or to the use of their cash collateral,
12   which consents were expressly required by the DIP Lender and the DIP Facility
13   documentation as a precondition to the DIP Facility.

14   The Bankruptcy Court's exercise of discretion in approving the compromises
15   that were incorporated into the Final DIP Order was appropriate and warranted.
16   Given that the Prepetition Secured Creditors are oversecured, the Debtors and their
17   unsecured creditors would gain nothing by attempting to make a claim under Section
18   506(c).  Case law and logic dictate that Section 506(c) is a very narrow remedy that
19   can be invoked only when the expenditure of unencumbered estate funds is strictly
20   necessary to preserve the value of a secured creditor's collateral.  Here, the
21   Prepetition Secured Creditors are oversecured and would be paid in full regardless
22   of whether the bankruptcy estate expends funds to preserve or protect their collateral.
23   Therefore, such expenditures by the Debtors are not necessary, within the meaning
24   of Section 506(c), for the Prepetition Secured Creditors to be paid in full, and any
25   potential right to bring a claim under Section 506(c) would be futile.  Similarly, there
26   is no detriment to the unsecured creditors on account of the Section 552(b) Waiver
27   because, under the facts of this case, there is no viable claim under that section.
28   According to the Committee, Section 552(b) is meant to reimburse unsecured

creditors if unencumbered post-petition estate assets (which would otherwise benefit unsecured creditors) are used to preserve or enhance the value of encumbered assets which benefit the secured party.  The Committee, however, failed to appeal that portion of the Final DIP Order which expressly granted a lien to the Prepetition Secured Creditors in all of the post-petition properties and assets of the Debtors as part of the adequate protection package.  Accordingly, the Committee is bound by the fact that there are no unencumbered, post-petition assets which could theoretically be used to enhance the value of the Prepetition Secured Creditors' collateral.

Although the Prepetition Secured Creditors believe that there would be no merit to any claim under either Section 506(c) or Section 552(b), the Waivers still add value to the adequate protection package because, at a minimum, they would prevent frivolous claims and suits that would need to be defended or could, conceivably, be used in an attempt to coerce the Prepetition Secured Creditors into paying a settlement.

Finally, the Committee ignores the fact that the Prepetition Secured Creditors provided real, additional value to the Debtors through their consent to the DIP Facility and, especially, by agreeing to allow their security interest to be primed. Bankruptcy courts in both this jurisdiction and throughout the country have for many years routinely included the Waivers as part of adequate protection packages granted to lenders such as the Prepetition Secured Creditors, especially where such creditors have agreed to allow their otherwise first priority lien position to be primed by security interests granted to a new lender.  Such consent is, as an economic and mathematical matter, the functional equivalent by the Prepetition Secured Creditors of agreeing to provide new or additional credit to the Debtors because the priming loan must be paid first, in full, before any payment whatsoever is made to the Prepetition Secured Creditors.  Even the Committee admits in its brief that, where a creditor is taking on additional credit risk (here, the risk that the DIP Lender with its

priority position will not be paid in full), such creditor would be entitled to the Waivers.

### B.    Factual Background

On August 31, 2018 (the "<u>Petition Date</u>"), the Debtors in these jointly administrated cases each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  (Committee's Appx. No. 1; Bankr. Docket No. 1).  Since the commencement of their cases, the Debtors have been operating their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

Debtor, VHS, is a California nonprofit public benefit corporation and is the sole corporate member of five California nonprofit public benefit corporations that operate six acute care hospitals (the "<u>Hospitals</u>") and other facilities in the state of California, each of which is named as a Debtor in this case.  (Committee's Appx. No. 4; Bankr. Docket No. 8 at ¶ 11).

VHS, the Hospitals and their affiliated entities operate approximately 1,680 inpatient beds, six active emergency rooms, a trauma center, eleven medical office buildings, and a host of medical specialties, including tertiary and quaternary care.  *Id.* at ¶ 12.

UMB Bank, N.A. serves as successor master trustee for the holders of nine series of debt securities comprising the largest secured claim against the Debtors, totaling in excess of $461 million.  (Committee's Appx. No. 3, Bankr. Docket No. 32 at 3-4).  Wells Fargo Bank, National Association, serves as indenture trustee for three of those series of debt instruments issued in 2005 in an outstanding amount exceeding $259 million.  *Id.*  U.S. Bank, National Association, serves as indenture trustee for both the 2015 Notes and the 2017 Notes issued in an outstanding amount exceeding $202 million.  *Id.*  The aggregate debt owed to the Prepetition Secured Creditors is secured by liens and security interests on the Debtors' primary assets, including, without limitation, all five of the Debtors' acute care hospitals, a host of

related facilities, and other assets such as receivables, equipment, inventory, and intangibles.

As of the Petition Date, the Debtors alleged that they had an immediate need for access to additional credit in the form of debtor-in-possession financing, and the need to use the pre- and post-petition cash collateral generated from the prepetition liens of the Prepetition Secured Creditors.  (Committee's Appx. No. 3; Bankr. Docket No. 32 at ¶¶ 12-13).  Without the Bankruptcy Court's approval of the new financing and the Debtors' use of the Prepetition Secured Creditors' cash collateral, the Debtors alleged that the existence of the Hospitals would have been threatened and their ability to survive as a going concern would have been irreparably harmed. *Id.* at ¶ 11A.

Prior to the Petition Date, the Debtors had solicited offers to secure post-petition financing, and had determined that the $185 million DIP Facility proposed by Ally Bank, the DIP Lender, represented the best offer.  (Committee's Appx. No. 3; Bankr. Docket No. 32 at ¶¶ 17-18).  The DIP Facility grants to the DIP Lender valid, perfected, continuing, enforceable, non-avoidable first priority liens and security interests (the "Priming Liens") on literally all of the Debtors' assets (the "Collateral"), which Priming Liens prime all other liens and security interests on the Collateral in existence as of the Petition Date, including the liens of the Prepetition Secured Creditors. *Id.* at ¶ 40.  Importantly, the terms of the DIP Facility documentation required, as a precondition to its effectiveness, *inter alia,* that the Prepetition Secured Creditors voluntarily consent to, or not oppose or appeal, entry of the Interim DIP Order or the Final DIP Order. *Id.* at Ex. 3, § 3.3(b).

On the Petition Date, the Debtors filed their *Emergency Motion of Debtors for Interim and Final Orders (A) Authorizing The Debtors To Obtain Post Petition Financing (B) Authorizing The Debtors To Use Cash Collateral And (C) Granting Adequate Protection To Prepetition Secured Creditors Pursuant To 11 U.S.C. §§ 105, 363, 364, 1107 And 1108* (the "Financing Motion") (Committee's Appx. No.

6

2; Bankr. Docket No. 31).  Among other things, the proposed form of order that accompanied the Financing Motion lacked customary waivers, including the Waivers presently at issue.  The Prepetition Secured Creditors desired and expected such waivers as part of their adequate protection package and as part of the *quid pro quo* for being asked to consent to the terms of the DIP Financing and the priming of their first priority lien.  *Id.* at Ex. A.

The Prepetition Secured Creditors informally objected to the initial Financing Motion and, after a number of meetings, consultations and negotiations with the Debtors and other interested parties, the Debtors agreed to include the Waivers in their proposed initial financing order.  Accordingly, the Waivers were included in the Interim DIP Order that was entered by the Bankruptcy Court following a hearing on September 6, 2018. (Committee's Appx. No. 9; Bankr. Docket No. 86 at 19).

After entry of the Interim DIP Order, negotiations among the parties continued with respect to the form of a final financing order.  In addition to their efforts at a negotiated resolution, the Prepetition Secured Creditors also filed written objections and attended and presented oral arguments at the Bankruptcy Court hearing regarding consideration of the final order.  Contrary to the Committee's assertion, the Prepetition Secured Creditors, on behalf of one of their largest bondholders, offered, both during the negotiations and in open court at the final hearing, to provide post-petition financing to the Debtors under terms similar to, or better than those provided by the DIP Lender.  (Committee's Appx. No. 28, Bankr. Docket No. 380 at 9-10; Committee's Appx. No. 35 at 11:12-19; 15:13-17:14).

The final hearing with respect to the Financing Motion was held on October 3, 2018.  At that hearing, the Prepetition Secured Creditors and the Debtors ultimately agreed upon language to be utilized in the final order and consented to a form of order that was thereupon entered by the Bankruptcy Court as the Final DIP Order.  (Committee's Appx. Tab 35; Bankr. Docket No. 428 at 25).  In determining to approve the agreed-upon terms of the Final DIP Order, the Bankruptcy Court

7

relied upon evidentiary declarations by the Debtors' chief executive officer, its chief financial officer, and its lead financial and investment adviser. (Committee's Appx. Nos. 16, 35, 4, 21, 3, and 21; Bankruptcy Docket Nos. 273, 428, 8, 309 at Ex. 3, 32, and 309 at Ex. 2), as well as extensive oral argument presented by the parties, including the Committee.  Notably, the Committee failed to present any evidence in opposition to the Final DIP Order or object to the declarations and other evidence presented by the Debtors.  Accordingly, the Committee waived any evidentiary objections to the Bankruptcy Court's Final DIP Order.  *See* Rule 9013-1(i) (2) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California.  After hearing the Committee's oral argument, the Bankruptcy Court specifically overruled the objections made by the Committee which are now the subject of this appeal.  (Committee's Appx. No. 29; Bankr. Docket No. 392 at p. 10-11).

As part of its ruling at the final hearing, the Bankruptcy Court adopted its so-called tentative ruling, dated October 3, 2018 (the "<u>Tentative Ruling</u>"). (Committee's Appx. No. 29; Bankr. Docket No. 392).  The Tentative Ruling includes findings that the DIP Facility provides the Debtors with a "realistic opportunity to sell their assets for a price that will yield between $150–$225 million in excess of existing secured debt." (Committee's Appx. No. 29; Bankr. Docket No. 392 at p. 8).  The Committee has not appealed this finding that the Prepetition Secured Creditors are oversecured.

Among other things, the Tentative Ruling also determined that the inclusion of the Waivers in the adequate protection package was a necessary inducement for the parties to come to an agreement on the language in the Final DIP Order. (Committee's Appx. No. 29; Bankr. Docket No. 392 at p. 9); *id.* at 11 (overruling Committee's objection to the Section 506(c) Waiver as it was necessary to induce the lenders to extend financing); *id.* (overruling Committee's objection to the Section 552(b) Waiver as such waivers are "routinely granted" and are reasonable in light of

8

obtaining the consent of the Prepetition Secured Creditors).

The findings made by the Court in the Final DIP Order explicitly recognize that the Prepetition Secured Creditors are entitled to the adequate protection package, and that they had made a number of valuable concessions and compromises that will benefit the Debtors and the unsecured creditors.  For example, the Final DIP Order found that:

- the Prepetition Secured Creditors are "entitled to receive adequate protection as set forth in this Final Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any [future] Diminution in Value (as defined herein) of … of their … interests in the Prepetition Collateral (including Cash Collateral)." *Id.* at ¶ K(i), p. 10;

- the DIP Facility is necessary to allow the Debtors to provide vital patient care and to preserve the value of their estates.  *Id.* at ¶ K(ii), p. 10;

- the Priming Liens, as consented to by the Prepetition Secured Creditors, "will enable the Debtors to continue borrowing under the DIP Facility and to continue operating their businesses for the benefit of their estates and creditors."  (Committee's Appx. No. 34; Bankr. Docket No. 409 at ¶ K(i), p. 10);

- the Prepetition Secured Creditors only "consented to the use of their respective interests in Cash Collateral, subject to the terms and conditions set forth in this Order."  *Id.*  at ¶ R, p. 15;

- the DIP Lender and the Prepetition Secured Creditors all acted in good faith in connection with negotiating the DIP Facility, and the DIP Lender and the Prepetition Secured Creditors were all acting in reliance on the consents and findings reflected in the Final DIP Order.  (Committee's Appx. No. 34; Bankr. Docket No. 409 at ¶ 5(a)-(g) and ¶ 28, p. 37-38); and

- even if the Debtors' cases did not proceed as planned, administrative creditors would still benefit from the Prepetition Secured Creditors' subordination of their liens to the Carve Out (an amount available to pay the professional fees of the Debtors and the Committee). (Committee's Appx. No. 34; Bankr. Docket No. 409 at ¶ N, p. 13).

9

Most importantly, the Bankruptcy Court specifically found and determined that the Prepetition Secured Creditors were entitled to the Waivers on account of their agreements to "be subject to the Carve Out and subordinate to the DIP Liens." (Committee's Appx. No. 34; Bankr. Docket No. 409 at ¶ 5(f), p. 25).

## II.    <u>STANDARD OF REVIEW</u>

Where an issue or remedy is committed to the bankruptcy court's equitable powers, the bankruptcy court's decision is to be reviewed under an abuse of discretion standard. *See In re Lee*, Case No. 18-6851 (JFW), 2018 U.S. Dist. LEXIS 223420, \*7 (C.D. Cal. Dec. 7, 2018) (holding a choice of equitable remedies was to be reviewed on an abuse of discretion standard).  Adequate protection is considered a remedy subject to the abuse of discretion standard. *See In re Sunnymead Shopping Ctr. Co.*, 178 B.R. 809, 814 (B.A.P. 9th Cir. 1995) (noting that "adequate protection payments… serve as a way to protect [a creditor's] interest in bankruptcy, where state remedies are not available," and finding bankruptcy court's decision regarding adequate protection did not constitute an abuse of discretion); *see also People's Capital & Leasing Corp. v. Big3D, Inc. (In re Big3D, Inc.)*, 438 B.R. 214, 291 (B.A.P. 9th Cir. 2010) (citing *Paccom Leasing Corp. v. Deico Elects., Inc. (In re Deico Elects., Inc.,* 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992) ("A bankruptcy court's decision regarding adequate protection is reviewed for abuse of discretion.").

When considering the exercise of discretion, "a 'reviewing court cannot reverse unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" *Sunnymead,* 178 B.R. at 814 (quoting *In re Goldberg*, 168 B.R. 382, 384 (B.A.P. 9th Cir. 1994)).

10

### III.   **ARGUMENT**

#### A.   **The Adequate Protection Package Approved by the Bankruptcy Court, Including the Waivers, Was Granted as Part of an Appropriate Exercise of the Bankruptcy Court's Discretion**

It is undisputed that entry of the Final DIP Order was dependent upon receiving the voluntary consent of the Prepetition Secured Creditors.  The DIP Lender and the documentation evidencing the DIP Facility made such consent a precondition of closing.  Absent consent or a finding that a secured creditor is adequately protected, a debtor is not authorized to offer priming liens to a new lender or to use the cash collateral of an existing lender.  *See* 11 U.S.C. § 363(c)(2) (authorizing debtor in possession to use cash collateral only upon secured creditor's consent or pursuant to court order); *id.* § 363(e) (debtor is prohibited from using secured creditor's collateral absent adequate protection); *id.* § 364(d)(1) (authorizing debtor in possession to incur superpriority senior secured or "priming" liens only if (a) the debtor is unable to obtain financing from another source, and (b) the interests of the secured creditors whose liens are being primed by the post-petition financing are adequately protected); *see also Hari Ram, Inc. v. Magnolia Portfolio, LLC (In re Hari Ram, Inc.),* 507 B.R. 114, 120 (Bankr. M.D. Pa. 2014) (noting that either consent or adequate protection is required); *Scottsdale Medical Pavilion v. Mutual Benefit Life Ins. Co. (In re Scottsdale Medical Pavilion),* 159 B.R. 295, 302 (B.A.P. 9th Cir. 1993) (same).

It is well recognized that adequate protection may take many forms and is determined on a case-by-case basis.  *See, e.g., In re Am. Mariner Indus., Inc.,* 27 B.R. 1004, 1006-07 (B.A.P. 9th Cir. 1983) (citing 2 Collier on Bankruptcy ¶ 361.01[1] (15th ed.)) ("[T]he ultimate meaning of the term [adequate protection] will be developed in a case-by-case basis, in each instance with the relief being tailored to the fact situation."); *In re Pelham Street Assocs.,* 131 B.R. 260, 263 (Bankr. D. R.I. 1991) (citations omitted) ("'[A]dequate protection' under the Code

is a flexible concept, to be tailored to the particular facts and circumstances of each case."); *In re Briggs Transp. Co.,* 35 B.R. 210, 217 (Bankr. D. Minn. 1983) (same).

In this case, the Prepetition Secured Creditors permitted their liens to be primed by the DIP Facility, and also consented to the use of their cash collateral during the pendency of the bankruptcy cases, on the express condition that such consent was in return for the adequate protection package that they had negotiated in the final version of the Final DIP Order.  The Waivers, which are an integral part of that adequate protection package, were not simply an afterthought or part of boilerplate language.  The Debtors and the Prepetition Secured Creditors engaged in extensive negotiations regarding every aspect of the adequate protection package, including the Waivers.  Put simply, the Bankruptcy Court determined, in the exercise of its discretion and after considering the evidence and the arguments, that the adequate protection package embodied in the Final DIP Order *is* the proper adequate protection based on the facts and circumstances of this case and the results of the arms' length negotiations of the parties.

The Committee argues that the Prepetition Secured Creditors are not entitled to the Waivers because their interests are otherwise adequately protected.  At best, this is circular reasoning.  The Committee is arguing that the Waivers should be stricken because the value of the Prepetition Secured Creditors' collateral is not at risk and, therefore, by definition, the secured claims of the Prepetition Secured Creditors will assuredly be paid in full from such collateral; but, the clear intent and purpose of the Committee's demand to strike the Waivers is, in fact, to create that very risk, *i.e.*, that the Prepetition Secured Creditors will not be paid in full from their collateral because the Committee may either seek to surcharge the collateral under Section 506(c) or restrict the scope of the collateral under Section 552(b).  The Committee cannot have it both ways.  It cannot, on the one hand, argue that the Waivers are unnecessary overkill because full payment is assured and, on the other hand, argue that the Waivers should be stricken so as to create the risk that full

12

1    payment is not assured.

2           None of the cases cited by the Committee support its position that the adequate

3    protection package approved by the Bankruptcy Court was an abuse of discretion.

4    In fact, a number of cases actually undercut the Committee's argument.   For

5    example, the Committee argues that the sole purpose of adequate protection is to

6    protect against diminution to the secured creditor's equity cushion, not to improve

7    that cushion, citing the Tenth Circuit B.A.P.'s unpublished decision in *In re Bluejay*

8    *Props., LLC*, BAP No. KS-12-105, 2014 Bankr. LEXIS 949 (B.A.P. 10th Cir. Mar.

9    12, 2014).  *Bluejay* does not stand for the proposition alleged by the Committee.  The

10   bankruptcy court below had determined that even though the mortgage lender was

11   significantly oversecured by the value of the debtor's real property, it was also

12   entitled to a replacement lien in future rents and ongoing interest payments as further

13   adequate protection.   The court's reasoning was based upon its view that the

14   collateral package of the lender should be considered as a whole.  *Id*. at *14.  The

15   lender appealed, claiming that it was entitled to separate adequate protection for its

16   mortgage interest in the real property and for its security interest in the rents.  *Id.* at

17   *12.  The appellate court rejected this argument and upheld the cash collateral order,

18   as the bankruptcy court's findings were not clear error.  *Id.* at *20-21.  This directly

19   undercuts the Committee's argument that, since the Prepetition Secured Creditors

20   have an equity cushion, they are not entitled to any further adequate protection such

21   as the Waivers.  *Bluejay* does not even mention waivers under Section 506(c) or

22   552(b) and, moreover, it contradicts the Committee's argument that the applicable

23   standard of review is *de novo*.  *Id*. at *7.

24          Even if *Bluejay* did stand for the proposition alleged by the Committee – it

25   does not – the equity cushion of the Prepetition Secured Creditors as determined by

26   the Bankruptcy Court is not improved by the Waivers.  The Waivers simply ensure

27   that such equity cushion is preserved and cannot be eroded by frivolous legal

28   challenges, which is exactly the purpose and rationale for the concept of adequate

                                             13

1    protection under the Bankruptcy Code.  Under any reasonable interpretation, cases

2    such as *Bluejay* simply do not support the Committee's argument; instead, they

3    buttress the conclusion that the Final DIP Order should be affirmed.

4         The inability of the Committee to cite authority which stands for the

5    proposition that a Bankruptcy Court cannot approve Section 506(c) and 552(b)

6    waivers when a secured creditor is oversecured is not surprising.  Courts in the Ninth

7    Circuit and elsewhere routinely include Section 506(c) and 552(b) waivers in orders

8    approving a debtor's use of both cash collateral and post-petition financing.  In fact,

9    it is the experience of the Prepetition Secured Creditors that it is the rare and unusual

10   case in which such waivers (assuming they are requested) are not approved.

11       **B.    The Bankruptcy Court Properly Exercised Its Discretion in**

12       **Approving the 506(c) Waiver.**

13       The general rule in bankruptcy proceedings is that, absent an express

14   agreement to the contrary, the expenses associated with administering a bankruptcy

15   estate must be borne by the unencumbered assets of the estate rather than charged to

16   a secured creditor's collateral.  *See  In re Cascade Hydraulics & Utility Service, Inc.,*

17   815 F.2d 546, 548 (9th Cir. 1987); *see also* 4 Collier on Bankruptcy ¶ 506.05 (16th

18   ed. 2019).  Section 506(c) of the Bankruptcy Code provides an exception to that

19   general rule, and permits a trustee to recover administrative expenses from a secured

20   creditor's collateral only if (1) the expenses are strictly "necessary" to preserve or

21   dispose of the collateral; (2) they are "reasonable;" and (3) the incurrence of the

22   expenses provided a direct "concrete and quantifiable benefit" to the secured

23   creditor.  *See Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie*

24   *Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061, 1068 (9th Cir. 2001).

25       A claim under Section 506(c) may only be brought by the debtor-in-

26   possession or the trustee; individual creditors may not bring such an action to recover

27   expenses.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. 1,

28   9 (2000).  The Ninth Circuit has taken the Supreme Court's ruling in *Hartford*

14

*Underwriters* a step further by holding that an individual creditor does not have standing to object to a settlement agreement that prevents it from bringing a surcharge action under Section 506(c). *See Debbie Reynolds*, 255 F.3d at 1065.

> **1.    The Scope of Section 506(c) Is Extremely Narrow, and It Is Unlikely That Any Such Claim Would be Successful, Especially Given the Prepetition Secured Creditors' Admitted Equity Cushion.**

The Committee drastically overstates the likelihood and circumstances under which courts permit the use and application of Section 506(c) and, in doing so, grossly exaggerates the probability that it would be entitled to surcharge the Prepetition Secured Creditors' collateral.    The Section 506(c) exception is exceptionally narrow and subjects the debtor to an "onerous burden of proof."  *See Debbie Reynolds*, 255 F.2d at 1068 (noting that the Section 506(c) standard is "not an easy standard to meet").  In order to satisfy the requirements of Section 506(c), the trustee "must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral," as "Section 506(c) is not intended as a substitute for the recovery of administrative expenses normally the responsibility of the estate." *Cascade Hydraulics,* 815 F.2d at 548 (citations omitted) (finding that to the extent the secured creditor benefited from the estate's purchase of out-of-stock inventory and bi-monthly statements, such benefits were "incidental" and did not "fall within the scope of section 506(c)").  A Section 506(c) claim, therefore, can only survive upon a high evidentiary showing.

The showing necessary to establish a viable Section 506(c) claim becomes even more difficult when a creditor is oversecured, such as in the case of the Prepetition Secured Creditors.  The logic is simple.  If the creditor has an equity cushion in excess of its secured claim, it is unlikely that any expenditures by the debtors made to preserve or dispose of the creditor's collateral were necessary to ensure that such secured claim was paid in full.  By definition, even without the debtor's expenditures, the secured creditor would have been paid in full; therefore,

1  such expenditures are not strictly "necessary" to enable full payment.

2  The Committee admits, and the Bankruptcy Court explicitly held, that the

3  value of the Prepetition Secured Creditors' collateral significantly exceeds the

4  amount of their secured claims.  In a case such as this, it would be difficult or

5  impossible to establish a meritorious Section 506(c) claim because there is very

6  likely sufficient value in the collateral to satisfy the Prepetition Secured Creditors'

7  claim in full even absent the intervening bankruptcy and any expenses incurred as

8  part of the bankruptcy proceeding.  Given that the Prepetition Secured Creditors

9  would be paid in full regardless of whether the bankruptcy process occurred, the

10  Prepetition Secured Creditors are not receiving any direct benefit from the expense

11  of administering the bankruptcy case, and such expenditures are not "necessary" to

12  ensure full payment under the test of Section 506(c).  *See, e.g., In re OccMeds Billing*

13  *Servs.,* Case No. 07-28444-A-11, 2007 Bankr. LEXIS 4136, at *12 (Bankr. E.D. Cal.

14  Dec. 1, 2007) (noting that if creditor is oversecured, costs incurred to maintain its

15  collateral do not benefit the secured creditor, because such a creditor will be paid in

16  full plus costs as long as the collateral's value exceeds the secured creditor's claim);

17  *In re Ware,* Case No. 12-30566-KLP, 2014 Bankr. LEXIS 2437, at *17 n. 19 (Bankr.

18  E.D. Va. Jun. 3, 2014) ("Courts generally refuse to charge the costs of preserving

19  and disposing of collateral to the secured creditor if disposition of the property

20  generates a sufficient amount to pay both the expenses and the secured claim in

21  full."); *Toledo Trust Co. v. Roberts (In re Nicholson Indus., Inc.),* 73 B.R. 266, 270

22  (Bankr. N.D. Ohio 1987) (same).

23  Once again, the Committee has cited cases that not only fail to support its

24  arguments, but actually undermine its position.  The Committee cites *In re Codesco,*

25  *Inc.,* 18 B.R. 225 (Bankr. S.D.N.Y. 1982) for the proposition that Section 506(c) was

26  intended to require that the secured creditor bear any of the costs associated with

27  maintaining or disposing of its collateral during a bankruptcy case.  The court in

28  *Codesco,* however, actually *denied* the motion to surcharge the creditor's collateral,

16

noting that

> [w]here the proceeds from a trustee's sale of encumbered property are sufficient to cover the actual costs associated with the sale and to pay the secured claim in full, it has been held that Code § 506(c) does **not** authorize charging the encumbered assets with foreclosure costs because the lienholder received no benefit and would have realized full satisfaction of its claim without the intervention of the trustee.

(emphasis added). *Codesco, Inc.*, 18 B.R. at 228-29 (citing *In re Robertson,* 14 B.R. 706 (Bankr. N.D. Ga. 1981)).

Likewise, in *Compton Impressions, Ltd. v. Queen City Bank N.A. (In re Compton Impressions),* 217 F.3d 1256, 1260-61 (9th Cir. 2000), the Ninth Circuit held that the debtor's costs to complete the development and sale of residential units subject to the secured creditors' liens were not necessary under Section 506(c) because the secured creditors were oversecured.  Had they simply foreclosed at the outset of the bankruptcy cases, the secured creditors would have been paid in full.  Any unreimbursed expenses incurred by the debtor and its professionals only served the debtor in its attempt to salvage some equity.  Those efforts could not have been beneficial to the secured creditors or helpful to the secured creditors' recovery, as such recovery was already assured because the value of the secured creditors' collateral significantly exceeded the amount of the secured claims.  *Id.* at 1261.[3]

Much like the secured creditors in *Compton Impressions*, the Prepetition Secured Creditors have the benefit of an equity cushion of between 26% and 40%. (Committee's Appx. No. 29 at 9).  Any funds expended to preserve, market and sell the Prepetition Secured Creditors' collateral are not necessary, within the meaning of Section 506(c), for the Prepetition Secured Creditors to receive full recovery.  Rather, after paying secured claims in full, any additional value generated as a result of the Debtors' preservation, marketing and selling expenses will inure to the benefit

---

[3] The *Compton Impressions* court affirmed the bankruptcy court's order as affirmed by the district court, which denied the debtor's surcharge motion except to the extent of a $10,000 surcharge regarding certain attorney's fees.

of the unsecured creditors.  Since the ultimate beneficiaries of such expenditures are not the Prepetition Secured Creditors, it is extremely unlikely that any such costs would be recoverable against them under Section 506(c).  In fact, it would be irrational to conclude that the law requires the Prepetition Secured Creditors to bear the burden of expenses that were incurred not to benefit them, but to benefit the unsecured creditors.

Given the low likelihood that any claim under Section 506(c) would be meritorious, the Section 506(c) Waiver does not substantively impair the rights of the unsecured creditors, despite the protestations of the Committee.  On the other hand, the 506(c) Waiver is valuable to the Prepetition Secured Creditors because it is always possible that they could be subject to frivolous litigation.  The Prepetition Secured Creditors would also be entitled to increase their secured claim by the amount of any defense costs, thereby lowering the recovery to other creditors.  For these reasons, the Bankruptcy Court properly exercised its discretion in approving the adequate protection package negotiated by the parties and implemented by the Final DIP Order.

### 2.    Section 506(c) Waivers Are Commonplace and Not Contrary to Public Policy.

Waivers of the potential to recover a surcharge under Section 506(c) are customary in Chapter 11 cases.  In fact, such waivers are so prevalent that the local rules for the United States Bankruptcy Court for the District of Delaware, the court in which many large Chapter 11 cases are filed, contain a special provision regarding Section 506(c) waivers.  *See* Del. Bankr. Ct. Loc. R. 4001-2 (a)(1)(c) (including Section 506(c) waivers among other provisions to be highlighted in financing motions).

The Committee's assertion that Section 506(c) waivers are routinely held to be unenforceable is a gross misstatement of the law.  The Committee once again cites to case law which is, at best, irrelevant.  For example, the Committee cites

18

*In re InteliQuest Media Corp.,* 326 B.R. 825, 830 n. 31 (B.A.P. 10th Cir. 2005) for the proposition that Section 506(c) waivers are "unenforceable per se." The *InteliQuest* Court actually **affirmed** the order of the bankruptcy court which **denied** a motion to compel the trustee to bring an action under Section 506(c), on the grounds that the applicable financing order contained a 506(c) waiver. *InteliQuest* expressly rejected the holding of the **one** district court that had found Section 506(c) waivers contrary to public policy. *Id.* at 831 (rejecting *McAlpine v. Comerica Bank-Detroit (In re Brown Brothers Inc.),* 136 B.R. 470 (W.D. Mich. 1991)).

In reality, courts in the Ninth Circuit and, specifically, in this district routinely approve adequate protection packages that include a waiver of the debtor's potential ability to surcharge a secured lender's collateral pursuant to Section 506(c). Such waivers have been granted in circumstances that are similar to this case, namely circumstances where the secured creditor has consented to the debtor's use of cash collateral and in cases involving consent to additional debtor-in-possession financing. *See, e.g., Weinstein v. Gill (In re Cooper Commons LLC)*, 512 F.3d 553 (9th Cir. 2008) (upholding Section 506(c) waiver negotiated by lender and debtor); *In re Gardens Reg'l Hosp. & Med. Ctr, Inc.*, Case No. 2:16-bk-17463-ER, 2016 Bankr. LEXIS 4715, at *43 (Bankr. C.D. Cal. Jul. 28, 2016) (approving Section 506(c) waiver as part of adequate protection package in return for consent to use of cash collateral and to post-petition financing); *In re Downey Reg'l Med. Center-Hospital, Inc.,* Case No. 09-bk-34714-BB, 2010 Bankr. LEXIS 5205 (Bankr. C.D. Cal. Sept. 17, 2010) (approving Section 506(c) waiver as part of adequate protection package in final cash collateral order for the benefit of indenture trustee in consideration of trustee's consent to debtor's use of cash collateral as well as consent to allow trustee's first-priority security interest to be primed by post-petition lender's lien); *In re 944 Media, LLC*, Case No. 2:10-23240-AA, 2010 Bankr. LEXIS 3904, at *12 (Bankr. C.D. Cal. May 7, 2010) (entering final DIP and cash collateral order including 506(c) waiver); *In re Walking Co.*, 9:09-bk-15138-RR, 2010 Bankr.

19

LEXIS 5194, at *21 (Bankr. C.D. Cal. Jan. 14, 2010) (approving debtors' motion to obtain new credit facility and to use cash collateral, which included waiver of 506(c) claims against both prepetition secured parties and secured lenders providing DIP financing).

Section 506(c) waivers are also routinely approved in financing orders entered in some of the largest bankruptcy cases in the nation. *See, e.g., In re Sears Holdings Corp., et al.*, Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 30, 2018), *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [ECF No. 955] ("<u>Sears Financing Order</u>")[4] at 30 (waiving rights to surcharge DIP and certain prepetition lenders' collateral under Section 506(c)); *In re iHeartMedia, Inc., et al.*, Case No. 18-31274 (MI) (Bankr. S.D. Tex. Apr. 12, 2018), *Final Order (I) Authorizing Post-petition Use of Cash Collateral and (II) Granting Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C.§§ 105, 361, 362, 263, and 507, Bankruptcy Rules 2002, 4001, and 9014, and Local Bankruptcy Rules 4001-1(b) and 4002-1* [ECF No. 452] ("<u>iHeart Cash Collateral Order</u>") at 35 (waiving all rights to surcharge prepetition lenders' collateral under Section 506(c)); *In re Gen. Motors Corp., et al.*, Case No. 09-50026(REG) (Bankr. S.D.N.Y. Jun. 25, 2009), *Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Prepetition Secured Parties* [ECF No. 2529] at 14-

---

[4] Copies of orders cited herein that are unavailable on LEXIS or Westlaw are attached, without exhibits, hereto as <u>Exhibit A</u>.

15 (waiving 506(c) claims).

> **3.** **The Prepetition Secured Creditors Are Effectively Funding the Bankruptcy Cases as a Result of Their Consent to be Primed by the DIP Lender and Are Therefore Entitled to the Section 506(c) Waiver.**

The Committee admits that the DIP Lender is entitled to the Section 506(c) Waiver because it is providing post-petition credit to the Debtors, but that the Prepetition Secured Lenders are not entitled to the same rights because they are not providing any new consideration.   The Committee incorrectly states that the Prepetition Secured Creditors "were offered but declined the opportunity to provide such financing, sought out the adequate protection they received simply to sit out the Chapter 11 Cases and ride the coattails of the DIP Lender to maximize their recovery." Committee Br. at 33.  In point of fact, the Prepetition Secured Creditors, on behalf of one of the largest bondholders, ***did*** offer to provide post-petition financing to the Debtors, which offer was rejected.  (Committee's Appx. No. 28, Bankr. Docket No. 380 at 9-10; Committee's Appx. No. 35 at 11:12-19; 15:13-17:14).

When that offer was rejected, as an alternative, the Prepetition Secured Creditors consented, in exchange for the adequate protection package set forth in the Final DIP Order, to be primed by the DIP Lender to the extent of $185 million.  By such consent, the Prepetition Secured Creditors allowed the Debtors to have the new financing that they required in order to continue ordinary course operations and conduct sales of the Hospitals and their other assets as a going concern.   By consenting to the priming lien demanded by the DIP Lender, the Prepetition Secured Creditors effectively provided new consideration to the Debtors equivalent to the new financing provided by the DIP Lender.  Whether the DIP Facility had been provided by the DIP Lender or through the Prepetition Secured Creditors, the economic and mathematical effect was the same:  the Debtors had $185 million more in financing, and the secured claim of the Prepetition Secured Creditors would not

be paid unless and until $185 million was first paid to the lender providing debtor-in-possession financing. The Prepetition Secured Creditors are not "riding the coattails" of the DIP Lender. They have agreed to take on an additional $185 million of risk by subordinating their lien, which is the economic equivalent of providing new financing. In fact, that consent will also likely enable the Debtors to further increase the sale proceeds of the estates' assets which, in turn, will enable the unsecured creditors, represented by the Committee, to increase their recovery.

Given the consent to the DIP Lender's priming lien and to the DIP Facility, and the additional risk thereby incurred by the Prepetition Secured Lenders, the case law relied upon by the Bankruptcy Court in approving the Section 506(c) Waiver as "necessary to induce the lender to extend the necessary credit" also serves as ample authority justifying the approval of the Section 506(c) Waiver in order to induce the Prepetition Secured Creditors to provide their consents. (Committee's Appx. No. 29 at 11). *See In re Real Mex Restaurants, Inc.,* Case No. 11-13122 (BLS) [ECF No. 392] (Bankr. D. Del. Nov. 4, 2011) (waiving Section 506(c) claims for the benefit of prepetition lenders consenting to use of cash collateral and agreement to be primed); *In re Metaldyne Corp.,* Case No. 09-13412(MG), 2009 Bankr. LEXIS 1533 (Bankr. S.D.N.Y. Jun. 23, 2009) (overruling committee's objection to Section 506(c) waiver because the lenders were funding the bankruptcy cases); *In re Antico Mfg. Co.,* 31 B.R. 103, 106 n. 1 (Bankr. E.D.N.Y. 1983) (upholding the Section 506(c) waiver in the financing order as it induced the lender to continue funding the bankruptcy cases).

## 4. The Bankruptcy Court Weighed the Propriety of the Section 506(c) Waiver in Light of the Expenses to be Incurred in This Case and Found It Appropriate and Justified.

Since the Debtors filed their bankruptcy cases, there has been no question that the Debtors intended to pursue a sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code. *See Declaration of Richard G. Adcock in*

22

*Support of Emergency First-Day Motions*, dated August 31, 2018 (Committee's Appx. No. 4; Bankr. Docket No. 8 at ¶¶ 128-130).  On the first day of these cases, the Debtors immediately disclosed that they had been engaged in "substantial efforts to market and sell their assets" prior to the bankruptcy filing.  *Id.* at ¶ 128.  The Debtors had engaged investment bankers to identify potential buyers of the Debtors' assets, prepared a Confidential Investment Memorandum, and created an online data room in order to share information with potential buyers.  *Id.* at ¶ 129.  The Debtors represented to the Bankruptcy Court that they were continuing the sale process post-petition and shortly anticipated presenting a sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code.  *Id.* ¶ 130.  The Committee itself admits that the purpose of the bankruptcy filings was to sell the Hospitals and the Debtors' other health care facilities.  *See* Committee Br. at 1.

As a result of the disclosures made by the Debtors, there was never any mystery regarding the types or magnitude of expenses the Debtors would incur in connection with the sale of the Prepetition Secured Creditors' collateral, including fees for an investment banker, financial advisor and counsel to assist with the marketing and sale of the assets of a major hospital system.  With full knowledge of the type, scope and potential magnitude of the expenses that the Debtors would likely incur, the Bankruptcy Court, exercising its discretion, approved the inclusion of the 506(c) Waiver in the Final DIP Order.  Accordingly, there can be no credible argument that the Bankruptcy Court was unaware of the ramifications of the Section 506(c) Waiver, or that it failed to exercise proper discretion because it failed to consider those ramifications with respect to the unsecured creditors.

## C.  The Bankruptcy Court Properly Exercised Its Discretion in Approving the 552(b) Waiver

Section 552(a) of the Bankruptcy Code provides the general rule that the prepetition security interest of a secured creditor does not cover assets of the debtor acquired after commencement of the case.  However, Section 552(b) provides an

exception to the rule of Section 552(a).  Section 552(b) states that a prepetition security interest does cover post-petition proceeds of prepetition collateral, "except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise."  11 U.S.C. § 552(b).

The Committee alleges that the purpose of the so-called "Equities of the Case" exception to Section 552(b) is to prevent a secured creditor from reaping the benefits of an increase in the value of collateral which has been caused by the post-petition use of unencumbered estate assets (the value of which would otherwise have been available for unsecured creditors).  Committee's Br. at 35-36 (quoting *In re Muma Servs.,* 322 B.R. 541, 558-59 (Bankr. D. Del. 2008)).  In effect, the Committee would have to demonstrate that the value of the Prepetition Secured Creditors' collateral was enhanced by the post-petition use of unencumbered assets of the Debtors.  *See, e.g., In re Photo Promotion Assocs.,* 61 B.R. 936, 939 (Bankr. S.D.N.Y. 1986) (limiting the secured creditor's security interest in proceeds of its prepetition collateral based on the Section 552(b) Equities of the Case exception because those proceeds arose on account of the use of unencumbered estate property, *i.e.,* funds from another financing source not subject to the secured creditor's lien in proceeds).

Based upon a decision that is actually cited by the Committee, it follows that, if all of a debtor's assets are encumbered, there can be no "equities of the case" claim under Section 552(b).  In those circumstances, no unencumbered assets exist which could conceivably be used to enhance the value of collateral.  There is no detriment to unsecured creditors and no deprivation of any distribution because all of the debtor's assets are subject to a lien.  *See Muma*, 322 B.R. at 558-59.  In rejecting the Section 552(b) Equities of the Case argument, the *Muma* Court explained that "since all assets were the security of the [prepetition lender], it was only through the use of the [prepetition lender's] cash collateral (and the financing provided by the [post-petition DIP lender]) that the estate was able to continue to operate and maintain the value of the assets."  *Id.* at 559.

24

As in *Muma*, there are no unencumbered assets of the Debtors' bankruptcy estates that could be utilized to increase the value of the Prepetition Secured Creditors' prepetition collateral at the expense of the unsecured creditors. Because the Committee did not appeal the provisions of the Final DIP Order which grant replacement and adequate protection liens to the Prepetition Secured Creditors which expressly cover all of the assets and property of the Debtors, the Committee cannot contend that any of the Debtors post-petition assets are unencumbered. Accordingly, there can be no argument that any post-petition unencumbered assets exist which could conceivably increase the value of the prepetition collateral of the Prepetition Secured Creditors.

Further, because of the ample security cushion which existed on the Petition Date, there is no circumstance in which the Prepetition Secured Creditors could obtain a windfall that would need to be remedied by the Section 552(b) Equities of the Case exception. An oversecured creditor is only entitled to the value of its claim plus post-petition interest and fees; it may not receive more than 100% of its claim amount regardless of the value of its collateral. *See, e.g., In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 825 (Bankr. S.D.N.Y. 1982) (citations omitted) (noting that "if a creditor is undersecured, the lien will be equal to the value of the collateral," but if the creditor "is oversecured, it is the amount of the debt plus interest and expenses"). Therefore, any appreciation in the value of the collateral of the Prepetition Secured Creditors during the pendency of these cases will necessarily inure solely to the benefit of the unsecured creditors, not to the Prepetition Secured Creditors. Because they are already oversecured, the Prepetition Secured Creditors can only recover the amount of their secured claim. In short, there can be no benefit to the unsecured creditors from the 552(b) Equities of the Case exception, and there is no detriment to the unsecured creditors by including the 552(b) Waiver in the Final DIP Order.

1    Similar to the 506(c) Waiver, cash collateral and financing orders frequently
2    include a Section 552(b) waiver.[5]  *See, e.g., Downey Reg'l Med. Center-Hospital,*
3    2010 Bankr. LEXIS, at \*43 (granting Section 552(b) waiver in final cash collateral
4    order); *Walking Co.,* 2010 Bankr. LEXIS, at \*70 (granting 552(b) waivers with
5    respect to both prepetition secured parties and secured parties providing DIP
6    financing); Sears Financing Order at 30 (granting Section 552(b) waiver to both
7    prepetition and post-petition lenders in final financing order); iHeart Cash Collateral
8    Order at 14-15 (waiving Section 552(b) Equities of the Case exception with respect
9    to prepetition lenders); *In re Gen. Growth Props., Inc.,* Case No. 09-11977 (ALG),
10   2010 Bankr. LEXIS 5552 (Bankr. S.D.N.Y. Jul. 22, 2010) (granting 552(b) waiver
11   in final financing order); *In re Spheris Inc.,* Case No. 10-10352(KG), 2010 Bankr.
12   LEXIS 5764, at \*14-15 (Bankr. D. Del. Feb. 23, 2010) (granting 552(b) waiver in
13   final cash collateral and DIP financing order); *In re Majestic Star Casino, LLC,* Case
14   No. 09-14136(KG), 2009 Bankr. LEXIS 5014, at \*48-49 (Bankr. D. Del. Nov. 30,
15   2009) (granting 552(b) waiver in interim cash collateral and DIP financing order,
16   which waivers became effective upon entry of the final order).

17   Because there is no detriment to the unsecured creditors by including the
18   552(b) Waiver in the Final DIP Order, the fact that such waivers have been approved
19   under similar circumstances as part of adequate protection packages, and such
20   waivers are frequently approved in financing orders in this district as well as
21   nationally, the Bankruptcy Court was justified, in the exercise of its discretion, in
22   approving the 552(b) Waiver as part of the negotiated adequate protection package
23   embodied in the Final DIP Order.

24

25   ─────────────────────────
26   [5] As is the case with Section 506(c) waivers, Section 552(b) waivers are so prevalent
     that there is also a specific provision with respect to such waivers in the local
27   bankruptcy rules in Delaware.  *See* Del. Bankr. Ct. Loc. R. 4001-2 (a)(1)(h)
     (including Section 552(b) waivers among other provisions to be highlighted in
28   financing motions).

1   **IV.   <u>CONCLUSION</u>**

2          For the foregoing reasons, this Court should (i) deny the relief sought by the

3   Committee; (ii) affirm the Final DIP Order as entered by the Bankruptcy Court, and

4   (iii) grant Appellees such other and further relief as is just and proper.

5    Dated: April 15, 2019                     MINTZ LEVIN COHN FERRIS GLOVSKY
6                                              AND POPEO, P.C.

7                                              /s/ Abigail V. O'Brient
8                                              Abigail V. O'Brient

9                                              and

10                                             Daniel S. Bleck *(pro hac vice)*
                                               Paul J. Ricotta *(pro hac vice)*
11                                             Ian A. Hammel *(pro hac vice)*

12                                             *Attorneys for UMB Bank, N.A. as master*
13                                             *indenture trustee and Wells Fargo Bank,*
                                               *National Association, as indenture trustee*
14
                                               -and-
15
16                                             MCDERMOTT WILL & EMERY LLP

17                                             By:   /s/ Jason D. Strabo
                                                     Jason D. Strabo
18
19                                             and

20                                             MASLON LLP

21                                             By:   /s/ Jason M. Reed
22                                                   Jason M. Reed *(pro hac vice)*

23                                             *Attorneys for U.S. Bank National Association,*
                                               *not individually but as Series 2015 Note*
24                                             *Trustee and Series 2017 Note Trustee,*
                                               *respectively*
25

26   *Pursuant to Local Rule 5-4.3.4(a)(2)(i), Abigail V. O'Brient hereby attests that all
27   other signatories listed, and on whose behalf the filing is submitted, concur in the
     filing's content and have authorized the filing.

28

1

**CERTIFICATE OF SERVICE**

2
3
4

     I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 2029 Century Park East, Suite 3100, Los Angeles, California 90067.

5
6
7
8
9
10

     I hereby certify that on April 15, 2019, I electronically filed the **JOINT BRIEF OF INTERVENING APPELLEES UMB BANK, N.A., WELLS FARGO BANK, NATIONAL ASSOCIATION, AND U.S. BANK, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEES** with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF registered parties.

11
12

     I declare under penalty of perjury that the foregoing is true and correct. Executed on April 15, 2019, at Los Angeles, California.

13
14

DIANE HASHIMOTO

15
16
17
18
19
20
21
22
23
24
25
26
27
28

86265760v.4